IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Stanley Johnson, individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>Time Warner Entertainment-Advance/ Newhouse Partnership d/b/a/ Time Warner Cable, and Time Warner Cable Southeast LLC d/b/a Time Warner Cable,<br><br>　　　　　　Defendants. | C/A No. 3:15-cv-01727-CMC<br><br><br>Opinion and Order<br>on Motions<br>for Class Certification,<br>to Exclude Expert Witness, and<br>to Strike Exhibits<br>ECF Nos. 163, 178, 195 |

This matter is before the court on three related motions: (1) Plaintiff's motion for class certification (ECF No. 163 ("Class Certification Motion")); (2) Defendants' motion to exclude certain testimony of Plaintiff's expert John A. Kilpatrick, Ph.D. ("Dr. Kilpatrick") (ECF No. 178 ("*Daubert* Motion"))[1]; and Plaintiff's motion to strike certain evidence on which Defendants rely in opposing the Class Certification Motion and pursuing their *Daubert* Motion (ECF No. 195 ("Motion to Strike")). These motions are resolved as follows:

- Plaintiff's Class Certification Motion is denied (*infra* Discussion § I (pp. 6-24));

- Plaintiff's Motion to Strike is denied (*infra* Discussion § II (pp. 24-27));

- Defendants' *Daubert* Motion is granted (*infra* Discussion § III (pp. 27-38)).

---

[1] *Daubert* refers to *Daubert v. Merrell Dow Pharmaceuticals*, 508 U.S. 579 (1993).

# BACKGROUND

Plaintiff Stanley Johnson ("Johnson") filed this action on April 21, 2015, seeking recovery on behalf of himself and others similarly situated for alleged unauthorized placement of cable transmission lines and related equipment ("Cable Facilities") on land he purchased on July 1, 2014.[2] Johnson alleges the Cable Facilities were placed on his property (prior to his purchase) by Defendants Time Warner Entertainment-Advance/Newhouse Partnership d/b/a/ Time Warner Cable, and Time Warner Cable Southeast LLC d/b/a Time Warner Cable (collectively "TWC") or their predecessors.

**Early motions practice.** The matter has been before the court on a variety of procedural and potentially dispositive motions. These include motions to remand and dismiss, three motions for summary judgment, and a motion to deny class certification. *See* ECF No. 17, 39 (motion to remand and order denying motion); ECF Nos. 44, 57 (jurisdictional orders); ECF No. 35, 70, 73, 82, 84 (motions to dismiss and for summary judgment and orders resolving the same); ECF Nos. 90, 102, 109, 120 (second and third motions for summary judgment and orders denying those motions); ECF No. 110, 123 (motion to deny class certification and order granting that motion in part and denying it in part).

**Second and third motions for summary judgment.** The second and third motions for summary judgment are of some significance to the present motions because they addressed arguments that may impact manageability of a class action. These motions raised potential factual

---

[2]  Johnson's individual claims relate to placement of Cable Facilities above and below ground. Johnson's proposed (alternative) class definitions encompass only landowners with claims relating to Cable Facilities attached to above-ground, third-party utility poles.

and affirmative defenses to Johnson's claims that may not be susceptible to resolution on a class-wide basis including but not limited to whether the prior owner of Johnson's property consented to the presence of Cable Facilities and whether TWC acquired a prescriptive easement due to the more-than-twenty-year presence of the Cable Facilities on Johnson's property.

**Motion to deny class certification.**  TWC's motion to deny class certification is of even greater significance because it raised several arguments on which TWC now relies in opposing Johnson's motion for class certification.  ECF No. 110.  Most critically, TWC argued class members were not readily identifiable because it was not possible to identify potential class members without parcel-specific investigation including to determine whether (1) TWC Cable Facilities were located on (or above) the property and (2) if so, whether the Cable Facilities fell within an area of permissive use such as public rights-of-way or platted utility easements.  *E.g.* ECF No. 110-1 at 8.[3]

TWC raised related concerns as to manageability.  *See*, *e.g.*, *id.* at 10 n.3 (arguing any modification of the class definition that shifted resolution of these issues to a merits determination

---

[3]  TWC argued identifying the class would require multiple steps including, most critically:  (1) "analyzing system design files documenting Time Warner Cable's plant, and identifying individual parcels for which it cannot be readily ascertained that the facilities are located in a public right-of-way"; and (2)  physical inspection of each individual parcel . . . to determine whether Time Warner Cable's facilities are present as drawn on the system design files, and whether, either in whole or in part, cable facilities are located on the parcels:"  ECF No. 110-1 at 8.  TWC asserted whether Cable Facilities are actually present is not merely a theoretical concern because "the system design file is a visual representation of the system components necessary to maintain an adequate strength of signal in the area as opposed to a detailed 'paint by numbers' plan for its construction."  *Id.*; *see also id.* at 8-10 (addressing additional steps needed to determine if parcels burdened by Cable Facilities fell outside the class definition because the Cable Facilities were located in public rights-of-way or were subject to an easement including platted utility easements or third-party or predecessor easements that allowed placement of the Cable Facilities).

would pose manageability or common relief concerns precluding certification under Fed. R. Civ. P. 23(b)(3) or (b)(2)).  In addition to concerns relating to identification of class members, TWC pointed to arguments raised in its motions for summary judgment on Johnson's individual claims as evidencing the need for individualized proof (*e.g.* whether an existing or prior landowner had given consent to the presence of the Cable Facilities and whether TWC had acquired a prescriptive easement).

Johnson opposed this motion relying, in part, on a declaration by Dr. Kilpatrick.  Dr. Kilpatrick asserted (and Johnson argued) the issues in this action are comparable to those in *Barfield v. Sho-Me Power Elec. Coop*, 2013 WL 3872181 (W.D. Mo. 2013), in which Dr. Kilpatrick served as a testifying expert.[4]  ECF No. 122 ¶ 2.  Dr. Kilpatrick explained his intended methodology could be used "to ascertain the scope of the class [using] documents that . . . are likely available and probative to this inquiry." *Id.* ¶ 7.  Dr. Kilpatrick opined this action is, "from an analytical and appraisal perspective, very similar" to *Barfield,* where "damages were determined to be a simple function of the linear distance of cable easement transiting each property." *Id.* ¶ 8.  He asserted determining "actual length and location of these easements or easement segments is relatively simple, since records of cable installations and locations will be produced during the discovery process." *Id.* ¶ 9; *see also id.* at ¶¶ 10, 11 (explaining mapping parcels at issue would involve a "straightforward" process using geographic information systems

---

[4] *Barfield* was affirmed in part and reversed in part on appeal. *See Barfield v. Sho-Me Power Elec. Coop*, 852 F.3d 795 (8th Cir. 2017) (affirming class certification decision and summary judgment for one or more subclasses on trespass claim, reversing summary judgment and jury's award of damages on unjust enrichment claim, and remanding for further proceedings (*e.g.*, damages proceedings on trespass claim)).

("GIS") software that would provide "a detailed listing of the portions of the cable transiting each property, and a simple valuation formula which is consistent and systematic across the entire class").

The court held oral argument on TWC's motion to deny class certification on July 12, 2016. *See* ECF No. 126 (transcript of hearing). During the hearing, the court noted the circumstances at issue in *Barfield* were "much, much simpler" than in this action. *Id.* at 4-5. The court expressed concerns as to how a class could be adequately identified and whether individualized issues beyond class identification might preclude certification. *E.g.*, *id.* at 4.

The court granted the motion to deny class certification as the class was then defined, a ruling Johnson conceded was proper because of a fail-safe problem with the proposed class definition. The court denied the motion to the extent it sought to preclude class discovery or post-discovery pursuit of certification of a more narrowly defined class. It, nonetheless, forewarned counsel the class would have to be defined so "membership may be determined based on objective criteria through a manageable process." *Id.* at 31.

**Subsequent proceedings.** On July 21, 2016, the court entered a scheduling order setting an April 18, 2017 deadline for completion of class discovery and a May 2, 2017 deadline to move for class certification. Discovery proceeded and concluded as scheduled with Johnson identifying Dr. Kilpatrick as an expert witness on class identification and damages. Dr. Kilpatrick was deposed on March 31, 2017.

Johnson filed his Class Certification Motion on May 3, 2017. ECF No. 163. He subsequently amended the class definition to correct an oversight (exclusions addressed in second paragraph below), moving for certification of a class defined as follows:

> All owners in fee of real property in South Carolina—other than owners of railroad rights-of-way, platted utility easements, and/or public rights-of-way, streets and/or highways—upon whose property Time Warner Cable has installed and maintained cable (i.e., coax or fiber) or other communication transmission lines and related equipment (i.e., strand, pole pedestals, amplifiers, etc.) above the land on third-party utility poles.
>
> Excluded from the class are any federal, state, or local governmental agencies and any judges who have decided some or all issues in the case, any persons related to a judge in a manner that would disqualify the judge from hearing the case, and any chambers staff working for the assigned judge or other courthouse staff who perform tasks relating to this matter.

ECF No. 169.

Through his reply memorandum, Johnson proposes a further modification to remove the following exclusionary language from the first paragraph of the class definition: "other than owners of railroad rights-of-way, platted utility easements, and/or public rights-of-way, streets and/or highway." ECF No. 194 at 10 (arguing this would "defer possible right-of-way and platted utility easement issues to the merits phase of the litigation" and suggesting the modification may be necessary to avoid creating a fail-safe class).[5]

TWC also filed a *Daubert* Motion, seeking to exclude Dr. Kilpatrick's proffered opinion relating to class identification. ECF No. 178. Johnson opposed that motion and filed a Motion to Strike certain evidence on which TWC relies. All three motions are now ripe for resolution.

---

[5] For ease of reference, the court refers to the definition proposed initially (ECF No. 169, quoted above) as the "Opening Class Definition," the modified definition proposed in Johnson's reply memorandum as the "Reply Class Definition," and the categories of permissive use covered by the clause eliminated from the Reply Class Definition collectively as the "Excluded Areas of Permissive Use."

**DISCUSSION**

**I.     Class Certification Motion**

**A.     Rule 23 Standard**

Class certification is governed by Federal Rule of Civil Procedure 23.  Rule 23(a) provides that one or more members of a class may sue or be sued as representative parties on behalf of all only if:  "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  In addition, a class must satisfy the requirements set forth in one of the three sub-parts of Rule 23(b), which allow certification where:  (1) individual actions would risk inconsistent adjudications or adjudications dispositive of the rights of non-parties; (2) class-wide injunctive or declaratory relief is sought and appropriate; or (3) legal or factual questions, common to the proposed class members, predominate over questions affecting individual members.  *See Gunnells v. Healthplan Servs*., 348 F.3d 417, 423 (4th Cir. 2003).

In addition to these explicit requirements, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).  This is often referred to as the "ascertainability" requirement.  *Id.*

Certification is "proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Comcast v. Behrend*, 569 U.S. 27, ___, 133 S.Ct. 1426, 1432 (2013) (internal marks omitted).  The proponent of class certification carries the burden of establishing each of the requirements for class certification is satisfied.  *Id.*; *Gariety v. Grant*

7

*Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). This burden does not shift even if the underlying issue is one on which the party opposing certification bears the burden of proof at trial. *See Thorn v. Jefferson-Pilot Life Ins. Co.* 455 F.3d 311, 321 (4th Cir. 2006).

While class certification should not be conditioned on the merits of the case, findings necessary to the class certification decision may overlap with the merits. *Brown v. Nucor*, 785 F.3d 895, 903 (4th Cir. 2015). Where certification is sought under Rule 23(b)(3), the court must take a "'close look' at whether common questions predominate." *Comcast*, 569 U.S. at __, 1335 S. Ct. at 1432. Ultimately, the court "has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)).

**B.    Ascertainability**

**1.    Ascertainability Requirement**

As the Fourth Circuit explained in *EQT Prod. Co. v. Adair*:

>    We have repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972); *see also In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989) ("Though not specified in [Rule 23], establishment of a class action implicitly requires . . . that there be an identifiable class . . . ."), *abrogated on other grounds*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Our sister circuits have described this rule as an "ascertainability" requirement. *See*, *e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3d Cir. 2012). . . .

>    However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria. *See Marcus*, 687 F.3d at 593; *see also Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579-80 (1st Cir. 1986) (finding that a class failed to satisfy Rule 23 requirements because it would be impossible to identify class members without "individualized fact-finding and litigation").

The plaintiffs need not be able to identify every class member at the time of certification. But "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593; *see also* 7A Charles Alan Wright et al., Federal Practice & Procedure § 1760 (3d ed. 2005) ("[T]he requirement that there be a class will not be deemed satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.").

*EQT*, 764 F.3d at 358 (reversing decision to certify class and remanding for further consideration where "proposed classes raised serious ascertainability issues because they are defined to include both former and current gas estate owners" and "resolving ownership based on land records can be a complicated and individualized process[,]" which the trial court failed to adequately address).[6]

### 2. Arguments

**Johnson opening argument.** Johnson argues the class may be readily identified using objective criteria by (1) comparing data on different GIS maps to identify parcels above which TWC has Cable Facilities and then (2) eliminating parcels that fall within the exclusions from the class definition (railroad rights-of-way, platted utility easements, and public rights-of-way, streets and highways), again using GIS databases. He relies on the report and testimony of Dr. Kilpatrick to support the feasibility and manageability of both steps in the process.

**TWC response.** TWC responds that neither step has been or can be done using Dr. Kilpatrick's proposed methodology. It argues Dr. Kilpatrick's work to date is deficient for reasons addressed below as to TWC's *Daubert* Motion (*infra* Discussion § III). It maintains the class cannot, in any event, be identified without physical examination of each parcel and a search of its

---

[6] The appellate court directed the district court to "give greater consideration to the administrative challenges it will face when using land records to determine current ownership and assess whether any trial management tools are available" to aid in the process. *Id.* at 360.

title history, precluding a finding the class is readily ascertainable using the methods applied or proposed by Dr. Kilpatrick.

**Johnson reply.** Dr. Kilpatrick's Second Supplemental Declaration describes Dr. Kilpatrick's work to date as identifying a preliminary class list. It offers assurances he can and will employ additional steps to evaluate additional data to fully identify the class at later stages of the litigation. The data and methods are only generally described but all appear to be based on examination and comparison of electronic data rather than any physical examination of property or search of public records. Kilpatrick 2d Supp. Decl. ¶¶ 4, 5, 8-10. Johnson does not suggest any means of identifying the class other than through Dr. Kilpatrick's past and intended future work.

As noted above, Johnson also suggests, through his reply, that the class definition should be modified to remove the clause excluding class members whose parcels are burdened by Cable Facilities falling within Excluded Areas of Permissive Use. ECF No. 194 at 9, 10. He argues this modification would simplify identification of the class as it would only be necessary to determine the "owners in fee of real property in South Carolina . . . upon whose property Time Warner Cable has installed and maintained [Cable Facilities] above the land on third-party utility poles." *Id.*

### 3. Discussion –Merits (Ascertainabiltity)

**Effect of ruling on and overlap with *Daubert* Motion.** For reasons explained in Section III of this order, the court excludes Dr. Kilpatrick's opinion on class identification. Because Johnson suggests no other means of identifying the class, this leaves him with no evidence to support ascertainability. Even if the court did not *exclude* Dr. Kilpatrick's opinion on class identification, it would find his opinion on this issue *unpersuasive* for the same reasons the court grants TWC's *Daubert* motion as summarized below.

**Limited nature of work to date.** Dr. Kilpatrick's Report and Johnson's motion for class certification suggest the class *has been* identified, subject to possible minor modifications. *See*, *e.g.*, Kilpatrick Report ¶¶ 9, 10, 26, 59; ECF No. 163-1 at 15-17 (Johnson's opening memorandum referring to identification of class of 179,827 landowners). In contrast, in his March 31, 2017 deposition, Dr. Kilpatrick described his work, thus far, as identifying only "people who at max may be in the class" or a "universe of potential claimants" and acknowledged substantial additional work was needed to address inaccuracies in the data used and to address Excluded Areas of Permissive Use. Kilpatrick dep. at 63, 64, 80, 92, 93, 113-14.[7] Similarly, in his July 5, 2017 Second Supplemental Declaration, Dr. Kilpatrick describes his work, thus far, as identifying a "preliminary list of class members" and addresses multiple additional steps needed to identify the class. Kilpatrick 2d. Supp. Decl. ¶¶ 4, 9 (dated July 5, 2017).

In his Second Supplemental Declaration, Dr. Kilpatrick effectively concedes, as TWC argues, that his staff only used two of the three GIS layers he believed had been used to identify the class at the time of his deposition. Kilpatrick 2d Supp. Decl. ¶¶ 8, 9. He, nonetheless, maintains the layers that have been used allow him to show the "easement length for valuation purposes,"

---

[7]  *See*, *e.g.*, Kilpatrick dep. at 63, 64 (conceding he may have to go back and perform quality control and "spatial analysis" to determine location of TWC Cable Facilities, including the side of the road on which facilities are located but suggesting inaccuracies could be resolved using an unspecified "mass appraisal" mechanism); *id.* at 80 (repeating he has only determined the "universe of potential claimants," acknowledging TWC's claim the data used was inaccurate, and stating "we will want to examine any potential inaccuracy" "as we go forward"); *id.* at 92, 93 (stating any inaccuracies in DynamoSpatial data could best be resolved using "a systematic mass appraisal process"); *id.* at 113-14 (conceding an overlay of utility company pole location data and TWC polepad GIS data indicates poles at different locations, one of which might be in a highway right-of-way, and explaining future quality control would determine if the pole was, in fact, in the highway right-of-way).

"length of trespass for each parcel," or "amount of trespass (in linear feet)." *Id*. ¶ 10 (averring this method was accepted in *Barfield*). He fails to explain how his ability to *measure* the length of an alleged trespass for purposes of valuation cures the deficiencies in determining *whether there is, in fact, a trespass*.

In sum, Dr. Kilpatrick concedes he has not yet completed even the first step required to identify the class: determining whether, *in fact*, TWC Cable Facilities exist over parcels proposed to be included in the class. He has, at most, identified a universe of parcels that may, through future quality control steps, reveal parcels actually burdened by TWC Cable Facilities. Thus, even using Johnson's proposed Reply Class Definition, Dr. Kilpatrick has, by his own admission, not yet identified the class (or even parcels whose owners are class members). Using Johnson's Opening Class Definitioin, the problems are even more pronounced as Dr. Kilpatrick concedes he has not yet made any efforts to identify where Cable Facilities fall within Excluded Areas of Permissive Use.[8]

**Insufficiency of assurance of future cure.** Dr. Kilpartick's assurance that he can cure any errors through future work, including some "more granular examination post-certification" (Kilpatrick 2d Supp. Decl. ¶ 9), is too vague and comes too late to carry any weight. Dr. Kilpatrick does not explain what he will be examining on a "more granular" level. Neither does he explain what his more granular examination of the undisclosed sources will entail. For example, while Dr. Kilpatrick's Second Supplemental Declaration suggests the existence of some more locationally accurate set of GIS data that might be utilized to determine which parcels are burdened

---

[8] It is undisputed this step must be completed at some point in the litigation. Removing it from the class definition merely moves it from an ascertainability issue to a Rule 23(a) commonality, Rule 23(b)(2) cohesiveness, or Rule 23(b)(3) manageability concern.

by Cable Facilities, it does not identify the sources of that data, explain the methodologies that would be applied to that data, or offer more than Dr. Kilpatrick's personal assurance the planned future work will cure the deficiencies in class identification.

Johnson also fails to explain why, if more accurate data and better methods exist, they were not employed in the preparation of Dr. Kilpatrick's February 2017 Report. The delay in identification of a class (or, at the least, demonstration that a class actually can be adequately identified by administratively feasible means) is particularly significant given the age of this litigation and prior proceedings through which TWC raised and the court noted many of the concerns with class identification addressed in this order. *See also infra* Discussion § III (addressing *Daubert* Motion).

**What would be required to identify the class.** The court is not persuaded a class can be identified using any GIS technology, including any means suggested in Dr. Kilpatrick's Second Supplemental Declaration. In the most general terms, determining class membership under the Opening Class Definition will require (1) identification of parcels over which TWC has located aerial Cable Facilities attached to third-party utility poles, (2) exclusion of parcels where the Cable Facilities are located within Excluded Areas of Permissive Use (railroad rights-of-way, platted utility easements, or public rights-of-way, streets or highways), and (3) identification of the owners of those parcels during the time periods covered by this litigation. Determining class membership under the Reply Class Definition eliminates the second step, but not the first and third.

TWC has argued from the outset that neither the first nor second step can be accomplished using any available GIS or other electronic data, because such data is not locationally accurate and a high degree of accuracy is required to determine whether Cable Facilities are either located over a particular parcel (a requirement for both the Opening and Reply Class Definitions) or fall outside

Excluded Areas of Permissive Use (a requirement for the Opening Class Definition). TWC has also consistently maintained identifying any class will require individualized searches of property records to determine what easements (included platted utility easements) exist and physical examination of the property. Physical examination is required to determine whether any Cable Facilities, *in fact*, fall within parcel boundaries and outside any Excluded Areas of Permissive Use or other easements. Nothing Johnson has proffered persuades the court anything less will suffice to identify the class.

**Rulings in comparable cases.** Difficulty identifying class members and related manageability concerns under Fed. R. Civ. P. 23(b)(3) have contributed to denial of class certification in a number of cases similar to this one: cases alleging trespass due to placement of communications cables in easements granted in favor of entities other than the communications company. For example, in *Melton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 289 n.5 (D.S.C. 2012), the court denied certification of a class seeking to pursue claims against a power company for allegedly exceeding the scope of easements granted in favor of the power company. The claims were based on the power company's decision to grant telecommunications companies the right to use the easements for general telecommunications purposes. The court denied class certification, in part, due to ascertainability concerns.[9]

---

[9] The primary reason for denial of class certification in *Melton* was plaintiff's reliance on a fail-safe class definition. *Melton*, 283 F.R.D. at 289. The court held "the class definition also fails because it is not administratively feasible for the Court to determine whether a particular individual is a member." *Id.* at n.5 (noting identification of class members would be cumbersome, expensive and fraught with managerial problems").

Similarly, in *Johnson v. Kan. City S., Ill. Cent. R.R.*, 224 F.R.D. 382 (S.D. Miss. 2004), the court denied certification of a class seeking to pursue claims challenging placement of communications lines in a railroad corridor based on arguments such lines exceeded the scope of the underlying easements or other rights of use. *Johnson*, 224 F.R.D. at 389. The court denied class certification in part due to the need for individualized review to determine class membership and noted its decision was "consistent with virtually every other court to have considered the availability of class certification in similar cases." *Id.*

To be sure, the mere fact a putative class action alleges trespass based on placement or use of communications lines in easements allegedly intended for other purposes does not foreclose a finding of ascertainability. For example, as Johnson notes, *Barfield* certified a class of landowners to pursue claims against two utilities and their subsidiaries challenging use of communications cables for purposes the landowners alleged exceeded the scope of easements granted in favor of the power companies. *Barfield*, 2013 WL 3872181 at *1.

*Barfield* is, however, distinguishable on multiple grounds. Most critically, there is no indication in the class certification decision that there was any difficulty identifying the parcels at issue. To the contrary, the parcels were subject to easements granted in favor of at least one defendant (the power company defendants) and the parcels themselves had been identified for one of the two sets of defendants prior to certification. *Id.* at *13 n.13 (noting "land underlying Sho-Me's fiber optic corridor has already been determined . . . and it should not be difficult to conduct a similar analysis to determine land underlying KAMO's corridor"); *see also id.* at *15 (holding "potential class consists of readily identifiable private landowners located in a defined geographic area" (internal marks omitted)). The subject easements had also already been identified and categorized at the time of class certification. *Id.* at *9 (noting, in discussing Rule 23(b)(3)

predominance factor, the "more than 6,900 easements" had been broken into seven categories based on their "purpose" language).

Further, the issue in *Barfield* was whether the communications subsidiaries' use of cable otherwise properly within easements granted to their parent companies exceeded the scope of the easements. It was not, therefore, necessary to resolve, in the first instance, the many issues that must be resolved here to determine if underlying parcels (whose owners may be class members) meet criteria necessary for inclusion in the class (*e.g.*, are, in fact, burdened by TWC Cable Facilities and (under Opening Class Definition) are not located within Excluded Areas of Permissive Use. *See id.* at * 7 (distinguishing railroad-corridor cases in addressing predominance factor, noting railroad cases "necessarily implicate more complex issues than those involved in easements between private landowners and Defendants" due to the many way in which railroads acquired their rights-of way).

**Conclusion as to Ascertainability.** Accordingly, the court finds Johnson has failed to meet his burden of demonstrating a class is ascertainable because he relies solely on an expert whose opinion as to class identification is excluded. Even if the opinion is not excluded, Johnson has failed to persuade the court that a class has been or may be identified by the means proposed by Dr. Kilpatrick or any means that would not require a title search and physical examination of each parcel whose owner may be a class member. This is true using either Johnson's proposed Opening Class Definition or Reply Class Definition. While the purposes for which physical examination is necessary are more limited under the Reply Class Definition, such examination is still required to determine whether the property is, in fact, burdened by TWC Cable Facilities.

### C.    Rule 23(a)

For present purposes, the court assumes without deciding the class satisfies Rule 23(a)'s numerosity and adequacy requirements under either proposed definition.  Commonality and typicality present a close question given the divergent interests within the proposed classes.[10]  This is particularly true under Johnson's proposed Reply Class Definition, which would include in the class a significant number of persons whose claims will all but inevitably fail on grounds not applicable to Johnson or the remainder of the class (owners of parcels burdened by Cable Facilities that are located within Excluded Areas of Permissive Use).  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (holding the "common contention" required by Rule 23(a) "must be of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke" and relying on *Nagareda*, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 131-32 (2009), in stating the key question is whether there are common answers likely to drive resolution of the litigation and "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers.").  The need to establish use is non-permissive (as an element of class claims) and to address TWC's affirmative defenses (including prescriptive easement) raise additional concerns as to commonality and typicality.  The court need not resolve whether the divergent circumstances of class members under the proposed definitions preclude satisfaction of these criteria because they clearly preclude certification of a Rule 23(b)(3) or (b)(2) class for reasons discussed below.

---

[10]  The divergent interests are discussed below in sections I.D.1. (addressing manageability and superiority under Rule 23(b)(3)) and I.D.2 (addressing cohesiveness under Rule 23(b)(2)).

**D.      Rule 23(b)**

Johnson seeks certification of a class for money damages under Rule 23(b)(3) or, alternatively, for injunctive relief under Rule 23(b)(2).  As explained below, the court finds Johnson has failed to establish certification is proper under either subpart.

          1.      **Rule 23(b)(3).**

As explained in *Thorn v. Jefferson-Pilot Life Ins. Co.* 455 F.3d 31 (4th Cir. 2006):

> Rule 23(b)(3) has two components:  predominance and superiority.  The predominance requirement is similar to but "more stringent" than the commonality requirement of Rule 23(a). . . . Whereas commonality requires little more than the presence of common questions of law and fact, . . . Rule 23(b)(3) requires that "questions of law and fact common to the members of the class predominate over any questions affecting only individual members." . . . The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. . . . The superiority requirement ensures that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

*Thorn*, 445 F.3d at 319 (quoting Fed. R Civ. P. 23(b)(3)).[11]  In determining predominance and superiority, the court may consider multiple factors including but not limited to "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; . . . and (D) the difficulties likely to be encountered in the management of a class action."  *Thorn*, 445 F.3d at 319.

Here, while there may be issues common to the putative class (that is, questions capable of classwide resolution), those issues do not predominate.  For reasons explained above, the court finds there are significant individualized issues to be resolved to ascertain class membership under

---

[11]  In *Dukes*, 564 U.S. at 350, the Supreme Court held the commonality requirement of Rule 23(a) required common contentions capable of classwide resolution.

either proposed definition, both of which require Johnson to establish each class member owns (or owned at a time covered by this litigation), a parcel burdened by TWC Cable Facilities. Johnson has not persuaded the court even this issue can be resolved without a title search and physical examination of each property, an inherently individualized determination.

Johnson must also establish the Cable Facilities burdening each class member's property fall outside Excluded Areas of Permissive Use, either to establish class membership (under Opening Class Definition) or liability (under Reply Class Definition). This question also requires individualized determination involving physical examination of the property. These issues, alone, raise serious manageability concerns and weigh heavily against finding common issues predominate or class treatment is superior.

Similar issues are raised as to private easements.[12] Johnson, to this point, has made only a limited attempt to identify private easements that allow placement of TWC's Cable Facilities on private property. That attempt is limited to consideration of easements produced by TWC that reflect both execution and recording and even this work is incomplete. While neither of Johnson's proposed definitions exclude owners of properties with such easements from the class, he concedes in his reply memorandum that it is undisputed "current owners of these parcels do not have a claim." ECF No. 194 at 10.

_____

[12] This would include but not be limited to easements granted to TWC or its predecessors by the current or former landowners, including owners of what may previously have been larger parcels that were later subdivided. It may also include easements granted to the utility companies that own the poles to which TWC has attached Cable Facilities, depending on the particular wording of those easements.

The court is not persuaded that these are the only relevant easements. To the contrary, even if the only easements subject to consideration are those that have been recorded, TWC's inability to produce a recorded copy from its records is not dispositive.[13] Determining whether easements are recorded will, instead, require a time-consuming search of courthouse records at least for those properties where there is some hint of the existence of an easement if not for all properties not excluded based on the Excluded Areas of Permissive Use. *See* Kilpatrick dep. at 38 (conceding searching records at courthouse could take from a few minutes to a few days per property). Whether treated as a class identification issue, a merits issue on which the class bears the burden of proof, or an affirmative defense, Johnson bears the burden of persuasion that this issue can be resolved on a classwide basis. *Thorn*, 445 F.3d at 321, 322. The court is not persuaded it can be resolved on such a basis. *See*, *e.g.*, *supra* Discussion § I.A. (discussing ascertainability).

Beyond these threshold issues, there are substantial individualized issues that either must be established as part of a claim or may be raised as a defense and, consequently, that Johnson bears the burden of establishing are capable of classwide resolution. These include issues relating to affirmative consent through means other than recorded easements, absence of objection despite knowledge of the presence of Cable Facilities, and prescriptive easement defenses given the many years the Cable Facilities have been in place. These issues are not merely theoretical possibilities

---

[13] TWC points to evidence easements of which it has only signed copies may, in fact, have been recorded.

as demonstrated by TWC's earlier summary judgment motions, which raised these defenses and were denied, in part, due to the presence of genuine issues of material fact.[14]

Subclassing may allow resolution of some of these issues for groups of property owners. For example, subclasses might be used to address the effect of a variety of prior customer service agreements or to address similar language in other documents arguably evidencing permissive use (including easements granted to third-party utilities). It will, however, first be necessary to locate and categorize the relevant documents applicable to each property burdened by TWC Cable Facilities.[15] There will also be individualized issues based on what was known (or should have been known) to a property owner over the many years the Cable Facilities have been in place. These issues will go to both the merits of the claim (whether the challenged use is without

---

[14] TWC raised a variety of factual and affirmative defenses through its second and third motions for summary judgment as to Johnson's individual claims including: (1) the Cable Facilities were present on Johnson's property by consent because a former tenant requested service to the property with the consent of the landowner; (2) TWC was not required to remove the Cable Facilities after service ended unless and until the landowner requested removal; (3) Johnson failed to meet his burden of establishing initial placement of the Cable Facilities was without the landowner's consent (or, alternatively, that the landowner had not acquiesced to the presence of the Cable Facilities); and (4) the Cable Facilities were present on Johnson's property for a sufficient period of time and under circumstances that gave rise to a prescriptive easement. ECF No. 90-1 at 6-10; ECF No. 97 at 6-8; ECF No. 109-1 at 1, 2.

[15] In his reply, Johnson explains "one of the first post-certification tasks will be to match class members against un-recorded easement grantors (or other forms of permission) to discern whether a *current* owner granted the instrument such that [TWC] should be deemed to have a factual defense (i.e., permission) with respect to that class member." ECF No. 194 at 10 (emphasis in original). Johnson asserts "this task can be performed uniformly across the class." *Id.* What Johnson describes as a "uniform" process appears to be a process that will identify either a host of individualized issues or, at the least, multiple sub-class issues (for different forms of easement and other forms of permission), each of which will require resolution. Moreover, even if the questions may be resolved in a "uniform" manner, the answers will be divergent, dividing the class into various subclasses that will eliminate claims for some and allow others to proceed.

permission) and defenses (*e.g.*, whether TWC has acquired a prescriptive easement). Thus, the court finds a class action is neither reasonably manageable nor superior to other means of resolving the trespass and related claims that may exist between putative class members and TWC.

### 2. Rule 23(b)(2)

Johnson argues certification is proper, in the alternative, under Rule 23(b)(2) "because injunctive relief for ejectment of [TWC's] corridor from class member land is the sort of uniform, indivisible remedy contemplated by Rule 23(b)(2)." ECF No. 163-1 at 53. Johnson describes the relief sought as "a simple remedy that can be uniformly applied regardless of parcel size or location." *Id.* at 55 (explaining "injunction would simply require [TWC] to remove the corridor from class property"). He argues certification of a Rule 23(b)(2) class would eliminate "concerns over predominance and superiority since the ability to grant uniform, injunctive relief subsumes these concerns." *Id.* (citing *Dukes*, 564 U.S. at 362-63; *Thorn*, 445 F.3d at 330). He, nonetheless, concedes certification under Rule 23(b)(2) would be "unwarranted" if this court follows *Barfield's* interpretation of *Dukes*. *Id.* at 54 (explaining the district court in *Barfield* read *Dukes* to treat "relief under Rule 23(b)(2) and (b)(3) as an either/or proposition" so that "entitlement to damages if trespass was proven" precluded certification under Rule 23(b)(2)).

"Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.'" *Dukes*, 564 U.S. at 360 (quoting Rule 23(b)(2)). "The key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* at 360 (quoting Nagareda, 84 N.Y.U.L. Rev., at 132). For this reason, Rule 23(b)(2) does not authorize certification of a class where

individual class members "would be entitled to a *different* injunction or declaratory judgment" or where "each class member would be entitled to an individualized award of monetary damages." *Id.* at 360-61 (emphasis in original) (also noting "the combination of individualized and classwide relief" is not appropriate under Rule 23(b)(2)).[16]

Johnson does not rely on pursuit of declaratory relief in support of class certification. Were he to do so, class certification would be denied because the predominant purpose of declaratory relief would be as a predicate for seeking monetary damages. *See Barfield*, 2013 WL 3872181 at *4-6 (denying certification under Rule 23(b)(2) because "the thrust of Plaintiffs claims are for monetary compensation").

Neither of Johnson's proposed class definitions will result in a class that satisfies the requirements for certification of a class seeking injunctive relief under Rule 23(b)(2).[17] For reasons explained in the preceding section (discussing Rule 23(b)(3) requirements), both proposed definitions (even if perfectly applied at the class identification stage) leave multiple issues for resolution that will not have a common answer for all members of the class. Johnson's assertion the "first task" after certification is to determine which class members own properties subject to unrecorded easements or other evidence of permissive use identifies one of many bases on which class members' claims may be resolved adversely to them without affecting the claims of the

---

[16] *Dukes* also noted due process concerns raised by certification of a Rule 23(b)(2) class seeking injunctive relief only given the absence of an opportunity to opt out and the "need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone[.]" *Id.* at 364.

[17] TWC no longer uses and has abandoned any cables on Johnson's property. It is, therefore, questionable whether he has standing to seek injunctive relief. For purposes of this discussion, the court, nonetheless, assumes without deciding that he has standing to seek such relief.

remainder of the class. ECF No. 194 at 10. Likewise, the need to determine which class members' properties fall within an Excluded Area of Permissive Use points to another split between the interests of class members.

Dr. Kilpatrick's Second Supplemental Declaration, similarly, points to a host of quality control measures that will either eliminate or add class members as the case proceeds (or result in loss of claims of those already determined to be class members). This, as well as the fact injunctive relief would only benefit current property owners, would require constant modification of the class list. As explained in *Dukes*, certification under Rule 23(b)(2) is inappropriate where ensuring pursuit of injunctive relief continued to predominate "require[s] the District Court to reevaluate the roster of class members continually." *Dukes*, 564 U.S. at 364 (addressing concern where only current employees would benefit from injunctive relief).

In sum, the shifting nature either of class membership or those class members whose claims survive the various reviews proposed by Johnson and Dr. Kilpatrick demonstrates the class lacks adequate cohesion to support certification under Rule 23(b)(2).

### E. Conclusion as to Class Certification

The court finds the class (1) is not readily identifiable under either the proposed Opening Class Definition or Reply Class Definition and (2) does not meet the requirements for certification under either Rule 23(b)(2) or (b)(3). Accordingly, the court denies Johnson's Class Certification Motion.

## II. Johnson's Motion to Strike

**Johnson's argument.** Johnson moves to strike declarations of three witnesses as well as a number of exhibits TWC filed in support of its *Daubert* Motion and in opposition to Johnson's

Class Certification Motion.[18]  *Id.*  Johnson argues the challenged witnesses and exhibits should be excluded because he "had no notice of the foregoing witnesses or exhibits and thus had no opportunity to conduct depositions, serve written discovery, or otherwise investigate the nature of these submissions[.]" ECF No. 195 at 5.  Alternatively, he argues "some of the exhibits warrant exclusion for lack of foundation, authentication or as inadmissible hearsay."  *Id.*

**TWC's response.**  TWC responds two of the challenged witnesses (Hartman and Jacobs) were disclosed in discovery responses directed to class issues and the third (Mitchell) was not required to be disclosed because his testimony is offered solely to impeach Dr. Kilpatrick's opinion.  ECF No. 198 at 3 (noting Mitchell measured the distance from the center of the street to the utility poles surrounding the Matthew J. Perry, Jr. Courthouse, a task Johnson may easily replicate, precluding any prejudice).

**Discussion.**  Johnson's argument that Hartman and Jacobs were not disclosed has been abandoned and replaced with an argument the disclosure of these witnesses was untimely because these witnesses (1) should have been listed in TWC's Rule 26(a)(1) initial disclosures and (2) were disclosed no more than twenty-eight days before the close of class discovery.  The first argument fails because the court instructed the parties to start anew with class-related discovery following the July 2015 hearing on TWC's motion to deny class certification.  Failure to amend the initial

---

[18]  *See* ECF No. 195 (seeking to strike declarations of (1) Tim Hartman, TWC Regional Director of Facilities (ECF No. 179-2); (2) Jeff Jacobs, Former TWC General Manager (ECF No. 179-6); and (3) Angus Mitchel, TWC Permitting Department (ECF No. 180-8); and exhibits reflecting (4) various GIS parcel, subdivision, and tax maps (ECF Nos. 178-9, 178-10, 178-11, 178-13, 178-14, 178-17, 178-25, 180-7, 182-4); and (5) emails and other exhibits relating to the accuracy of GIS data obtained from DynamoSpatial (ECF Nos. 178-22, 178-23, 178-24, 181-8, 181-9, 181-10)).  DynamoSpatial is the entity from which Dr. Kilpatrick and his staff obtained GIS data reflecting parcel boundaries.

discovery responses would, in any event, be harmless assuming the witnesses were otherwise properly disclosed.

Johnson's second argument carries somewhat more weight as the timing of disclosure left little time to conduct depositions. The timeliness challenge, nonetheless, fails because Johnson waited until July 5, 2017, to challenge the delay in disclosure. Any such challenge should have been raised before the close of class discovery (in late April 2017) at which time the court might have afforded an opportunity for limited additional discovery if warranted.

It is also significant that Hartman and Jacobs, like Mitchell and all challenged exhibits, are offered in support of TWC's *Daubert* Motion and related arguments in opposition to class certification. All address claimed deficiencies in Dr. Kilpatrick's opinion testimony. That opinion is evidenced, in part, by Dr. Kilpatrick's February 20, 2017 Report (as corrected February 22, 2017). TWC disclosed two of the challenged witnesses roughly 28 days later, thus, soon after the expert report to which their proffered declarations relate. Dr. Kilpatrick's opinion was, moreover, modified substantially through his March 31, 2017 deposition (after the two witnesses were identified).

For reasons explained in Sections I and III of this Order, Johnson bears the burden of persuasion both that any expert opinion he offers satisfies the standards for admission and that all requirements for class certification are satisfied. The declarations and exhibits Johnson seeks to strike are offered for the purpose of challenging admissibility of and impeaching Dr. Kilpatrick's testimony. For both reasons, the court concludes the declarations and exhibits are properly considered for the limited purpose for which they are offered.

It is also significant Johnson had the opportunity to respond to the concerns raised through these declarations and exhibits. He did so through Kilpatrick's Second Supplemental Declaration.

ECF No. 193-1.  This opportunity has minimized if not eliminated any prejudice from the delayed disclosures.

Moreover, while Dr. Kilpatrick's Second Supplemental Declaration characterizes unspecified arguments of "the Defense [as] misleading or altogether false[,]" it does not directly contradict the challenged exhibits or declarations.  While Johnson may challenge admissibility of the referenced testimony and exhibits, Dr. Kilpatrick's deposition testimony and Second Supplemental Declaration concede the critical points:  Dr. Kilpatrick has not yet identified a class and substantial additional work using new data and methods is needed to accomplish that purpose. Any delay in disclosure is harmless under these circumstances.

Accordingly, the court denies Johnson's motion to strike.  The court, nonetheless, confirms it relies on the proffered exhibits only for purposes of impeachment.

## III.    TWC's *Daubert* Motion

### A.    Arguments of the parties

**TWC's opening argument.**    TWC's *Daubert* Motion challenges Dr. Kilpatrick's testimony as it relates to "[1] processing right-of-access documents to identify parcels subject to recorded easements, and [2] using GIS tools to identify parcels not subject to a recorded easement on which [TWC] has aerial [Cable F]acilities."  ECF No. 178 at 1.  TWC argues Dr. Kilpatrick both lacks sufficient expertise in the relevant areas and failed to apply reliable methods to sufficient data in forming his opinions.

TWC argues identification of class members requires four pieces of information reflecting the precise location of each of the following:  (1) cable strands; (2) property boundaries; (3) granted easements, licenses, or other permission, and (4) public utility easements or rights-of-way.  ECF No. 178-1 at 27.  TWC asserts Dr. Kilpatrick's GIS review was not based on precise location of

*any* of the four items, considered only some forms of permission under the third item, and failed, altogether, to consider the fourth item. *Id.* at 27-41.[19]

**Johnson's response.** Johnson responds that "Dr. Kilpatrick reasonably relied on technical assistance from his GIS mapping team . . . and document review by a third-party vendor whose work he oversaw." ECF No. 193 at 3. He relies on Dr. Kilpatrick's expert report (ECF No. 163-4), to explain the work performed by the third-party vendor and quality control measures performed by his staff. *Id.* at 3-5. Johnson argues the specific concerns TWC raises about Dr. Kilpatrick's methods and results are overstated and any errors can be resolved by updating the class list in future proceedings. *Id.* at 13-16. He also proffers a new declaration by Dr. Kilpatrick explaining his plan to address TWC's concerns through future quality control measures. Kilpatrick 2d Supp. Decl. (ECF No. 193-1).

As to accuracy of the GIS data used to identify potential class members, Johnson argues TWC's strand-layer database (the "Bentley" system) is more accurate than TWC admits and any inaccuracy "can likely be overcome through greater understanding and access to the Bentley system prospectively." *Id.* at 19. Johnson refers to the "highly accurate" pole locations provided

---

[19] For example, TWC notes Dr. Kilpatrick's team relied on TWC's schematic strand layer to determine the location of TWC's Cable Facilities. This layer is essentially a "schematic" wiring diagram that provides only a general proximity to where TWC planned to locate Cable Facilities. *Id.* at 28-32. The second layer considered (the boundary layer) was obtained from DynamoSpatial. Dr. Kilpatrick indicated minimal knowledge about the vendor or its data and rated it only a 5 for accuracy on a scale of 1-10. *Id.*. TWC argues the inaccuracies inherent in the two layers used (TWC's schematic strand layer and DynamoSpatial's boundary layer) were exacerbated by using the two together. TWC points to evidence of a 30% error rate in Dr. Kilpatrick's work based on examination of a sample covering a quarter-mile diameter area. *Id.* at 41, 42 (relying on testing by TWC's expert, purportedly evidencing a false positive rate of 16.1% and a false negative rate of 13.6%)

by SCE&G, presumably as a layer that *might yet be used* to address concerns with the locational accuracy of TWC's strand layer.[20]   Similarly, Johnson argues any accuracy concerns with DynamoSpatial data "can be corrected prospectively through a quality control review."  *Id.* at 20. Johnson concedes "post-certification, pre-notice refinement of the class list can (and must) be done" and asserts "aerial imagery is one way to refine the class list."  *Id.*  He argues any other concerns, including how to exclude parcels where TWC's Cable Facilities are in public rights-of-way or platted utility easements can and should be addressed post-certification.  *Id.* at 21, 22.  He concludes these concerns have no bearing on the reliability of the work Dr. Kilpatrick has done.

**TWC's reply.**  In reply, TWC asserts Johnson has failed to proffer evidence or argument Dr. Kilpatrick possesses or exercised expertise in performing the GIS and easement-review work that forms the foundation for his opinions on class identification.  ECF No. 197 at 1.  TWC argues Kilpatrick's reliance on a third-party is improper in light of the substantial concerns raised as to accuracy of the third-party work.  *Id.* at 2, 3.  Referring to Dr. Kilpatrick's Second Supplemental Declaration, TWC argues his "non-specific and unsupported assurance of future compliance with Rule 23" cannot cure the noted deficiencies.  *Id.* at 2.

B.      **Standard**

The party offering an expert bears the burden of establishing the admissibility of the expert's opinions by a preponderance of the proof.  *Cooper v. Smith & Nephew, Inc.*, 259 F.3d.

---

[20]  Dr. Kilpatrick's cited testimony (Kilpatrick dep. at 109-10) addresses only the accuracy of his *distance measurements* for lines that cross parcels, not accuracy of *where* or even *if* the lines cross the parcels.  It does not suggest Dr. Kilpatrick used a GIS layer reflecting actual pole locations.

194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10

(1993)).  The admission of expert testimony is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In testing reliability, "the district court must ensure the proffered expert opinion is based

on scientific, technical, or other specialized *knowledge*, and not on belief or speculation, and

inferences must be derived using scientific or other valid methods.  *Nease v. Ford Motor Co.*, 848

F.3d 219, 229 (4th Cir. 2017) (internal quotation marks omitted, emphasis in original).  "One

especially important factor" in the "reliability determination is whether a given theory has been

tested."  *Id.* at 231-32.  Additional factors include (1) whether the theory has been subject to peer

review and publication; (2) the known or potential rate of error; (3) the existence and maintenance of

standards controlling the technique's operation; and (4) whether the technique has achieved general

acceptance in the relevant scientific or expert community.  *United States v. Crisp*, 324 F.3d 261, 266

(4th Cir. 2003); *see also Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

**Two-part analysis.**  The plain language of Rule 702 requires a two-part analysis.  First,

the court must determine whether an expert is qualified to offer an opinion on the subject matter

at issue by virtue of "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.

Second, the court must determine whether the particular opinion offered satisfies the four requirements in Rule 702(a)-(d).  *Id.*

**Sufficiency of and connection to data.**  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Thus, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."  *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).

### D.     Discussion

**Scope of Challenge.**  TWC's *Daubert* Motion challenges two aspects of Dr. Kilpatrick's opinion testimony, both of which relate to his identification of class members.  Specifically, TWC challenges Dr. Kilpatrick's qualifications and opinions regarding (1) use of GIS tools to identify parcels potentially falling within the class definition and (2) treatment of right-of-access documents to identify parcels that should be excluded from the class.[21]

**Qualifications.**  For purposes of the *Daubert* Motion, the court assumes Dr. Kilpatrick has special expertise as an appraiser, which qualifies him to offer an opinion on mass appraisal or other valuation techniques useful in determining damages on a classwide basis.  He has, moreover, been qualified by other courts for this purpose.  *See Barfield v. Sho-Me Power Elec. Coop*, 2013 WL 3872181 (W.D. Mo. 2013).

---

[21]  The challenges at issue do not relate to Dr. Kilpatrick's opinion as to corridor valuation or mass appraisal methodology.  Thus, they do not implicate his opinions or qualifications as a real estate appraiser to offer such opinions.

While Dr. Kilpatrick's work as an appraiser requires use of GIS data and tools, that does not automatically translate into qualification to perform *class identification* work through a GIS-based methodology, particularly where, as here, locational accuracy is critical. In his deposition, Dr. Kilpatrick could not recall if he had previously been "qualified as an expert to perform the specific [GIS] analysis" used to identify parcels whose owners may fall within the class definition in this case. Kilpatrick dep. at 50. Dr. Kilpatrick's Report reveals no training or experience specific to this task although, as noted above, GIS work for appraisal purposes including mass appraisals for damages determinations in class actions is within his area of training and expertise.[22]

The record is, therefore, unclear as to whether Dr. Kilpatrick has training or experience specific to the tasks on which he offers an expert opinion: identification of burdened parcels using GIS data and tools where locational accuracy is critical to determining (1) whether parcels are in fact burdened and (2) (under Opening Class Definition) whether the burden falls outside Excluded Areas of Permissive Use (*e.g.*, public rights-of-way and platted utility easements).

It is also significant that Dr. Kilpatrick relied on a third-party vendor and his staff to perform substantial portions of the work. Despite asserting this work was done under his supervision, he was unable to provide details as to the data or methods used in performing that

---

[22] Johnson argues Dr. Kilpatrick should be found qualified because the work here is similar to the work for which Dr. Kilpatrick was found qualified in *Barfield.* There is, however, no indication in *Barfield* that there was any question as to whether the communications lines at issue crossed class members' parcels or whether the lines fell within any exclusion from the class definition. *See supra* Discussion § I.B.3 ("Rulings in comparable cases"—discussing *Barfield*). Neither is there any indication Dr. Kilpatrick offered opinion testimony on class identification (as opposed to damages issues). This is consistent with his deposition testimony that he did not recall having been qualified as an expert in the class identification methodologies used here. Kilpatrick dep. at 50.

work.[23]   This lack of knowledge suggests either a lack of expertise or a failure to utilize that expertise in the process.

These considerations raise concerns whether Dr. Kilpatrick is qualified to identify a class using the GIS data and techniques referenced in his report, deposition, and Second Supplemental Declaration or, if qualified, whether he actually used his knowledge and expertise in performing or supervising the work at issue. The court, ultimately, leaves the question of Dr. Kilpatrick's qualifications unresolved because it finds Dr. Kilpatrick's opinion inadmissible on other grounds for reasons addressed below.

**Reliability of opinion.** As noted above, to be admissible, expert testimony must be based on sufficient facts or data, the product of reliable principles and methods, and based on reliable

---

[23]  Throughout his deposition, Dr. Kilpatrick indicated either a lack of knowledge or an inability to recall details of the methodology used to identify the "universe of potential claimants" identified to that point. *Id.* at 19-21, 30, 31, 71, 72, 96-99. For example, in responding to questions about easement review, he was unable to recall (1) whether his team had a list of TWC's predecessor companies, (2) how his team handled easements signed by someone other than the property owner, or (3) what steps his staff took to check 10% of the third-party's easement review work. *Id.* at 19-21. He was also unable to recall whether his team compared acreage on an easement to the parcel to which it was linked or obtained and reviewed plats of easements. *Id.* at 30, 31. Similarly, with respect to the GIS review, he could not expand on what was in his report and was unable to explain what quality control, if any, had been performed. *Id.* at 71, 72 (stating some quality control is "implicit" in any GIS analysis, and he suspected some quality control was already performed, but could not affirmatively state if or what quality control work was done); *see also id.* at 96-99 (stating he could not "add in any color" to what was explained in his report regarding use of the GIS Intersect tool or confirm "what GIS layers were used in [the] process [he] signed off [on] and supervised," though he (incorrectly) believed the GIS layers used in the Intersect and Dissolve processes included pole locations from utilities). Dr. Kilpatrick also did not know whether DynamoSpatial implied its data had survey quality locational accuracy, could not recall the format or geographic projection of TWC's GIS data, and did not recall if or how projections were converted for comparison between different GIS layers. *Id.* at 58. Similarly, he did not know whether TWC's GIS data might reflect facilities that were never constructed and indicated virtually no knowledge about DynamoSpatial as an entity or its data, other than that it did not warrant locational accuracy. *Id.* at 81-83 (explaining his team selected and he approved DynamoSpatial).

application of the principles and methods to the facts of the case. Fed. R. Evid. 702 (b)-(d). Johnson has failed to meet his burden of demonstrating Dr. Kilpatrick's opinion on class identification satisfies any of these requirements.

The court reaches this conclusion even if it considers only Dr. Kilpatrick's deposition testimony and declarations (most critically, his Second Supplemental Declaration). While TWC's proffered evidence, including declarations and exhibits subject to Johnson's Motion to Strike, also supports this conclusion, it is not necessary to it.

**Sufficiency of data.** As Dr. Kilpatrick conceded in his deposition, he has, thus far, identified only a "universe of potential claimants." Kilpatrick dep. at 63, 64, 80, 92, 93, 113-14. Similarly, in his Second Supplemental Declaration, Dr. Kilpatrick describes the current class list as "preliminary," conceding it will "[u]ndoubtably need to be updated," refers to "adjustments and modifications that will certainly be made by my team . . . at a later stage in the litigation," an intent to "continue to update data throughout the process" and an ability to supplement the analysis "with a more granular examination, if and as needed, on an exceptions basis" during the merits or damages stages of the litigation. Kilpatrick 2d Supp. Decl. ¶¶ 4, 5, 8. 9; *see also id.* ¶ 10.

Both his deposition testimony and Second Supplemental Declaration attribute the incomplete status of his class-identification work, at least in part, to deficiencies in the data used and acknowledges the need for quality control steps that have not yet been taken. For example, in his deposition, Dr. Kilpatrick rated the locational accuracy of the three GIS layers he *believed* had been used to that point (the TWC strand layer, DynamoSpatial parcel boundary layer, and utility

company pole location layer) as fives on a scale of one to ten.[24]  Kilpatrick dep. at 54.  He

maintained he could get the data quality or result "from 5 to 9 or 9.5 through a rigorous analytical

process, a quality control process," though he conceded he had "not yet" begun that process.  *Id.*

at 55, 102, 103.

    While he opined any inaccuracies would be resolved at a later time, Dr. Kilpatrick offered

only general references to other data sources and methodologies that could be used for this

purpose.[25]  He makes similar statements in his Second Supplemental Declaration.  Kilpatrick 2d

Supp. Decl. ¶¶ 5, 9, 10.

    These statements and testimony, alone, persuade the court the data Dr. Kilpatrick used to

identify a "universe of potential claimants" or "preliminary" class list is insufficient even for that

---

[24]  TWC has presented uncontroverted evidence and Dr. Kilpatrick appears to now concede that
no utility-company, pole-location data was used in the GIS process.  *See* Kilpatrick 2d Suppl. Decl.
¶¶ 9, 10 (discussing two layers used).

[25]  *See* Kilpatrick dep. at 11-13 (indicating exclusion of parcels with facilities in applicable private
easements, public rights-of-way or platted utility easements would not be onerous, but not
indicating what data sources would be used); *id.* at 65 (referring to various GIS data sources
including utility data as to pole locations, aerial photographs, aerial maps, and other unspecified
GIS data that might be compared to determine locations and concluding "*if we have to examine
this for accuracy,* then a systematic methodology such as I have proposed here is far, far more
efficient and far, far more accurate than an atomistic property-by-property examination" (emphasis
added)); *id.* at 72, 73 (conceding he was not aware of any GIS source that would reflect public
rights-of-way across South Carolina); *id.* at 92 (referring generically to a "variety of databases"
that could be used for quality control purposes; *id.* at 102 (stating there were "highly accurate
databases available to us" but not identifying any specifically); *id.* at 114-16 (conceding he could
not identify a source for a public rights-of-way GIS layer, but stating records were available that
could provide the necessary information, which his staff could convert to usable electronic data
for purposes of performing quality control "between now and the damages phase"); *id.* at 163, 164
(stating if he has everything he is going to get from TWC, he can begin to look at "other data sets,
other parcel level data, the highway department data," but conceding he had not done this in the
months since receipt of GIS data from TWC and utility companies).

purpose.  Identifying a universe of potential claimants is, in any event, not enough.  Identifying class members, instead, requires determinations of the following: (1) whether TWC Cable Facilities are, *in fact*, on a given parcel; (2) if so, whether the Cable Facilities are located within Excluded Areas of Permissive Use; and (3) the owners of the parcels during the times covered by the litigation.  Dr. Kilpatrick's concessions preclude a finding the data used to date is sufficient for these purposes.

Through Dr. Kilpatrick's deposition testimony and Second Supplemental Declaration, Johnson suggests other data sources exist that might be used to cure the deficiencies.  *See* Kilpatrick dep. at 55, 102, 103; Kilpatrick 2d Supp. Decl. ¶¶ 4, 5, 8, 9.  Johnson has not, however, offered anything more than Dr. Kilpatrick's *ipse dixit* that the sources exist or would suffice for class identification.  Neither does he present a plausible explanation for why, if they exist, such sources were not used by Dr. Kilpatrick in preparing his initial report, particularly in light of the concerns raised by TWC in its motion to deny class certification and related concerns raised by the court during the July 12, 2016 hearing.  In any event, the court is not persuaded that any *GIS source* (or related methodology) *now* proposed by Dr. Kilpatrick would be sufficient, most critically that it would eliminate the need for physical examination of parcels or searches of public records.  *See supra* Discussion § I.B.3 ("What is required to identify the class.")

**Reliability of methodology and application of same to data.**  Dr. Kilpatrick's deposition testimony and Second Supplemental Declaration also defeat any claim the methodology he has used to this point is reliable for its intended purpose:  identifying members of the putative class (or parcels whose owners may be members).  As noted above, rather than explaining why the methodology addressed in his February 2017 Report is sufficient to identify the class, Dr. Kilpatrick conceded in his deposition that he had only identified a universe of potential claimants.

He also conceded a number of additional steps were needed to identify parcels whose owners comprise the class definition, describing those steps in general terms. While he testified quality control measures were critical to his work, he conceded they had not yet been begun. Kilpatrick dep. at 163, 164.

Dr. Kilpatrick's Second Supplemental Declaration, likewise, describes multiple additional steps (using new data sources) he intends to take at some point in the future to identify the class. Kilpatrick 2d Supp. Decl. ¶¶ 5, 8, 9, 10. As in his deposition, he does not argue that he has, to this point, reliably applied any reliable method to sufficient data to identify members of the class. Thus, Dr. Kilpatrick's deposition testimony and Second Supplemental Declaration defeat any argument his opinion satisfies these *Daubert* requirements. At best, they support the suggestion he may do so in the future.

Beyond arguments the work Dr. Kilpatrick has done or will yet do is similar to that accepted in *Barfield*, Johnson offers no support for any of the factors normally considered in testing expert opinion. Specifically, he offers no evidence the specific methods used thus far to identify the class or proposed to be used in the future (1) have been or can be tested, (2) have been subjected to peer review or publication, (3) have been evaluated for error rates, (4) are subject to any standards controlling their operation, or (5) have acquired general acceptance. *See Crisp*, 324 F.3d at 266. While Johnson may argue each of these points is satisfied as to use of GIS data and methodology generally or in support of mass appraisals, his burden here is to show that the specific data and methods used (or to be used) meet these criteria for the purpose for which they were utilized: identifying parcels that fall within the class definition where locational accuracy is necessary to that purpose.

In sum, Dr. Kilpatrick's deposition testimony and Second Supplemental Declaration effectively concede his work to date fails to satisfy the requirements for admission of expert testimony to the extent he offers an opinion on identification of the class. His testimony as to future steps he intends to take to cure the deficiencies (using different data and methodologies) are too vague to persuade the court they would serve the intended purpose.

Accordingly, the court finds Johnson has failed to meet his burden of demonstrating Dr. Kilpatrick's testimony on class identification is admissible. This is due to insufficiencies in the data used and failure to establish the methodologies used are reliable or that they were reliably applied.

## CONCLUSION

For reasons set forth above, Johnson's Class Certification Motion and his Motion to Strike are denied. TWC's *Daubert* Motion is granted. The parties shall confer and, within two weeks of entry of this order, propose a schedule to resolve Johnson's individual claims.

IT IS SO ORDERED.

s/ Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
Senior United States District Judge

Columbia, South Carolina
August 31, 2017